**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA

v.

ERICK R. BROWN, and MILAGROS L.
MORALES,

      Defendants.

---

Crim. No. 07–75 (CKK)

**MEMORANDUM OPINION**
(August 20, 2007)

Presently before the Court is [58] Defendants' Motion in Limine to Use Statements of the

Department of Justice as Statements of a Party-Opponent, previously held in abeyance and

revised by [81] Defendants' Supplement to Their Motion in Limine to Use Statements of the

Department of Justice as Statements of a Party-Opponent. An Opposition and Reply have been

filed to the Supplement thereto. After considering the aforementioned filings and the relevant

statutes and case law, the Court shall GRANT IN PART [58] Defendants' Motion in Limine to

Use Statements of the Department of Justice as Statements of a Party-Opponent, as revised by

[81] Defendants' Supplement to Their Motion in Limine to Use Statements of the Department of

Justice as Statements of a Party-Opponent. The single-underlined statements in attached

Exhibits 1 and 2 may be used as party admissions (though their manner of use may still be

subject to objection) if all single-underlined statements in that particular document are admitted

therewith.

## I. BACKGROUND

On July 25, 2007, Defendants Erick R. Brown and Milagros L. Morales filed [58]

Defendants' Motion in Limine to Use Statements of the Department of Justice as Statements of a Party-Opponent, setting forth various statements to be used as party admissions as taken from two documents from *United States v. Jones*, Cr. No. 2005FEL006847 (D.C. Super. Ct.), attached to the Motion in Limine: Exhibit 1, "Government's in Limine Motion to Preclude Mention of Conduct of Detectives Millagros [*sic*] Morales and Erick Brown," filed December 28, 2006; and Exhibit 2, "Government's Opposition to Defendant's Motion to Dismiss Indictment, filed November 27, 2006. In the Government's Response, filed July 30, 2007, the Government indicated that "Defendants have asked the Court to allow admission of two documents filed by Glenn Kirschner, Thomas DiBiase, and Lynn Haaland in the *Jerome Jones* litigation. The government does not object to the admission of these two pleadings in this matter." Gov't's Resp. at 3.

However, at the pretrial conference held on August 14, 2007, it became clear to the Court that there was not a meeting of the minds among Counsel with respect to Defendants' Motion in Limine, as Defendants intended to introduce certain statements as party admissions whereas the Government consented to the admission of the two documents in their entirety. After some discussion during the pretrial conference, during which both Defense Counsel and the Government agreed that legal arguments from the aforementioned documents should not be admitted in this case, the Court requested further briefing from the Parties in the absence of some agreement between them in which Defendants would specify precisely which statements they request to use as party admissions and the Government would specify the basis for its objections to the admission of statements as opposed to the documents in their entirety.

On August 15, 2007, Defendants filed [81] Defendants' Supplement to Their Motion in

2

Limine to Use Statements of the Department of Justice as Statements of a Party-Opponent.

Defendants propose to introduce three statements from the two Exhibits attached to their original

Motion in Limine as Party Opponents.  The Court shall attach the two Exhibits to this

Memorandum Opinion as Exhibit 1 and Exhibit 2 (respectively), and shall indicate Defendants'

proposal with a double underline.  However, for ease of reference, these statements are as

follows:

> [From Exhibit 1]

> Indeed, each of the witnesses stated that they did not think anything was wrong when the
> detectives asked them to change their testimony.

Exhibit 1 at 8, n.6.

> [From Exhibit 2]

> On or about February 13, 2005, at approximately 2:45 a.m., the defendant, Jerome Jones,
> got into a fight at the Club U nightclub formerly located in the Reeves building at 14th and
> U Streets, NW, Washington, D.C.  After arguing with the decedent in this case, Terrance
> Brown, on the dance floor, he stabbed him multiple times with a short-bladed instrument
> described by witnesses as a box cutter.

Exhibit 2 ¶ 1.

> On February 14, 2005, the detectives interviewed W-3 on videotape and she described
> what she saw of the fight.  She knew the defendant as Jerome through W-2 from previous
> occasions at the club.  She was approximately 6-7 feet from the defendant when he pulled
> out a knife and began throwing punches at the decedent with it. . . . W-3 positively
> identified the defendant as the person who stabbed the decedent.

Exhibit 2 ¶ 6.

On August 15, 2007, the Government filed a Response opposing Defendants' request to

introduce the three aforementioned excerpts on grounds that "the excerpts proposed by

defendants are wildly inconsistent with facts presented in the two submissions when the facts of

those filings are read in their entirety."  Gov't's Updated Resp. at 1.  However, "the government

does not object to the argument sections of the two submission [*sic*] being edited out, as these may cause confusion for the Court's jury." *Id.* (citing Subsection II of Exhibit 1 and paragraphs 17-20 of Exhibit 2 as legal arguments). The Government's Response references Federal Rule of Evidence 106 for its "rule of completeness argument." *Id.* at 2 (citing *United States v. Soures*, 736 F.2d 87, 91 (3d Cir. 1984) ("Under this doctrine of completeness, a second writing may be required to be read if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding.")).

In Defendants' Reply, filed August 17, 2007, Defendants correctly state that the Government does not object to the statements at issue being admitted into evidence, but only to their admission without the surrounding documents absent legal argument.[1] Defs.' Reply at 2. Defendants specifically argue that the Court has "wide discretion in allowing material to be introduced into evidence under Rule 106," and that the Government has failed to specify why the remainder of the documents are relevant or explain portions already admitted. *Id.* at 3 (citing *United States v. Caraballo*, 375 F.3d 797, 803 (8th Cir. 2004)).[2]

## II. DISCUSSION

Pursuant to Federal Rule of Evidence 801,

> The statement is offered against a party and is (A) the party's own statement, in either an
> individual or a representative capacity or (B) a statement of which the party has

---

[1] At a conference call on the record on August 17, 2007, the Government indicated that it may have objections as to the arguments Defendants may make as they relate to these admissions, specifically whether there is an inconsistency in the Government's statements in the *Jones* case and the case at hand.

[2] Neither the Government nor Defendants cited case law from the instant circuit with respect to their main arguments.

4

> manifested an adoption or belief in its truth, or (C) a statement by a person authorized by
> the party to make a statement concerning the subject, or (D) a statement by the party's
> agent or servant concerning a matter within the scope of the agency or employment, made
> during the existence of the relationship, or (E) a statement by a coconspirator of a party
> during the course and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2).  As the Government does not contest that the statements cited by

Defendants may be used as party admissions, but rather objects to their use in the absence of

surrounding statements included in the documents attached hereto as Exhibits 1 and 2, the

Court's analysis will focus on the propriety of admitting such statements in and of themselves

and the necessity (or lack thereof) of additional statements found in the Exhibits.  Pursuant to

Federal Rule of Evidence 106, "When a writing or recorded statement or part thereof is

introduced by a party, an adverse party may require the introduction at that time of any other part

or any other writing or recorded statement which ought in fairness to be considered

contemporaneously with it."  Fed. R. Evid. 106.

> Under the rule of completeness, which is contained in Federal Rule of Evidence 106,
> where substantial parts of a prior statement are used in cross-examination of a witness,
> fairness dictates that the balance be received so that the jury will not be misled.  The
> application of the rule of completeness is a matter for the trial judge's discretion, and the
> court properly exercised that discretion here by conditioning admission of the impeaching
> portions of the officers' prior statements on the admission of these prior statements in
> their entirety.

*United States v. Washington*, 12 F.3d 1128, 1137 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 828

(1994) (internal quotations and citations omitted).

    This Court, in its discretion, concludes that the statements proposed by Defendants need

not be accompanied by the documents in their entirety, but must be viewed by the jury as part of

complete factual proffers rather than in isolation such that they jury will not be confused or

misled.  Allowing the statements offered by Defendants in their Supplemental Briefing to be

admitted as partial statements or without the factual statements surrounding them, particularly in the case of Exhibit 2, would mislead the jury in failing to provide the factual context in which such statements were made. However, offering either the legal arguments set forth in the Exhibits or factual statements with respect to Defendants' actions themselves (which are at issue in the instant case) would be both confusing for the jury and prejudicial to Defendants, as their inclusion would effectively amount to the Government making its case in the context of statements made before another forum. Accordingly, the Court shall permit the statements set forth by Defendants in their Supplement to be used as party admissions[3] when accompanied by certain surrounding factual statements; the Court has attached Exhibits 1 and 2 such that Defendants' proposed statements are double-underlined and the statements that the Court requires be admitted as well if such double-underlined statements are offered are single-underlined.

Finally, the Court notes that Defendants' Reply indicates that "Detectives Brown and Morales are entitled to allow the fact finder to consider the fact that the government has made inconsistent representations about the same issue in separate legal proceedings." Defs.' Reply at 4. However, upon reviewing the Second Superseding Indictment and the statements set forth in Exhibits 1 and 2, the Court, as it understands Defendants' argument, does not find conclusive inconsistencies as implied by the Defendants.

### III. CONCLUSION

Based on the aforementioned reasoning, the Court shall GRANT IN PART [58]

---

[3] The Court withholds judgment, however, with respect to the manner of use of such statements, which is not the crux of the briefs presently before the Court.

Defendants' Motion in Limine to Use Statements of the Department of Justice as Statements of a

Party-Opponent, as revised by [81] Defendants' Supplement to Their Motion in Limine to Use

Statements of the Department of Justice as Statements of a Party-Opponent.  The double-

underlined statements in attached Exhibits 1 and 2 may be used as party admissions (though their

manner of use may still be subject to objection) if all single-underlined statements in that

particular document are admitted therewith.  An Order accompanies this Memorandum Opinion.


Date:   August 20, 2007


                                                    /s/
                                       COLLEEN KOLLAR-KOTELLY
                                       United States District Judge

# EXHIBIT 1



SUPERIOR COURT OF THE
DISTRICT OF COLUMBIA – FELONY BRANCH

UNITED STATES OF AMERICA           :    Criminal Case No. 2005FEL006847

vs.        FILED           :    Judge Herbert B. Dixon, Jr.

       :

JEROME JONES           :    Trial date: January 3, 2007

**GOVERNMENT'S IN LIMINE MOTION TO PRECLUDE MENTION OF CONDUCT OF DETECTIVES MILLAGROS MORALES AND ERICK BROWN**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this *in limine* motion to preclude mention of the conduct of Detectives Millagros Morales and Erick Brown, which can only be inflammatory. The defense likely will seek to use the conduct of the two detectives to argue that the jury should not believe the trial testimony of the three eyewitnesses. This argument is not supported by the facts and would be more prejudicial than probative, and likely to cause confusion for the jury. In support of this motion, the government relies upon the following points and authorities and any other points and authorities that may be cited at a hearing on this motion.

**I. BACKGROUND**

1.    The government expects its evidence to show as follows. On or about February 13, 2005, at approximately 2:45 a.m., the defendant, Jerome Jones, got into a fight at the Club U nightclub formerly located in the Reeves building at 14th and U Streets, NW, Washington, D.C. After arguing with the decedent in this case, Terrence Brown, on the dance floor, the defendant slashed at him multiple times with a short-bladed instrument described by witnesses as a box cutter. One other individual involved in the fight also had a knife. This man has been described by witnesses as wearing a black Coogi brand shirt. Security personnel broke up the fight by carrying the defendant and the decedent out separate entrances. They brought the decedent out



near the Industrial Bank entrance in the Reeves building lobby where he died from his wounds.

2.    The defendant was subsequently charged with Assault with Intent to Kill While Armed (box cutter), Possession of a Prohibited Weapon (box cutter) and Obstruction of Justice. The defendant has not been charged with the murder of the decedent.[1] The second stabber, the man in the black Coogi shirt, has yet to be charged. The defendant's trial is set for January 3, 2007.

3.    The United States expects the defense to raise the issue that the two detectives initially assigned to the case interfered with three of the eyewitnesses to such an extent that the trial testimony of these witnesses can not be credited. This assertion is not only false but permitting the defense to argue this will be a distraction to the jury. The United States agrees that the actions of the detectives were inexcusable, wrong and possibly even criminal.[2] However, ultimately, their actions did not interfere with the truthful testimony of the witnesses. Indeed, two of the three witnesses were videotaped by the detectives before the detectives' motive for influencing the witnesses to change their testimony (upon information and belief, to have the U.S. Attorney's Office sign the arrest warrant for the defendant as soon as possible) even arose. In other words, for two of the three witnesses, there is tangible evidence in the form of videotapes that the witnesses were not tainted, since their Grand Jury testimony matches those initial interviews and the detectives' interference comes between the two. For the third witness,

---

[1] According to the medical examiner, the fatal knife wound to the heart was administered by a knife with at least a three inch blade, not a box cutter.

[2] Indeed, an investigation of the detectives' actions in this case is being conducted by the United States's Attorney's Office for the Western District of Virginia. The United States Attorney's Office for the District of Columbia has recused itself from this investigation.

2

although her initial interview was not taped, she too, testified in the Grand Jury consistently with her initial interview and despite the detectives' actions.

**The Initial Investigation**

4.    On February 13, 2005, the lead detectives in the case at the time, Detective Erick Brown and Detective Milagros ("Millie") Morales, showed W-1[3] a photo array including the defendant. W-1 positively identified the defendant. On February 14, 2005, the detectives interviewed W-1 on videotape and she described what she saw of the fight. She was in the immediate vicinity with the decedent when the fight broke out. She did not see either the defendant or the decedent with a weapon. She knew the defendant as "Gerald" from previous occasions at the club. Prior to the fight, she had seen Gerald at the bar with the black Coogi-shirted man and provided a detailed physical description of both men.

5.    On February 14, 2005, the detectives also interviewed W-3 on videotape and she described what she saw of the fight. She knew the defendant as "Jerome" through W-2 (discussed below) from previous occasions at the club. She was approximately 6-7 feet from the defendant when he pulled out a box cutter and began throwing punches and slashing at the decedent with it. She provided a detailed physical description of both the defendant and the black Coogi-shirted man. That same day, Detectives Brown and Morales showed W-3 the same photo array including the defendant. W-3 positively identified the defendant as the person who stabbed the decedent.

6.    On February 15, 2005, armed with this evidence, the detectives requested

_____

[3] Witnesses will be referred to in the same manner as in the arrest warrant ultimately signed by the United States.

3

Assistant United States Attorney (AUSA) Jennifer Anderson's[4] signature on an arrest warrant for the defendant. After reviewing the affidavit in support of the arrest warrant and the case file, AUSA Anderson refused to sign the warrant and raised a number of issues with the warrant. The detectives were unhappy with AUSA Anderson's decision and pressured her to sign the warrant, claiming that they had probable cause to arrest the defendant for the murder of the decedent. AUSA Anderson refused to do so and demanded more evidence from the detectives and also requested to speak to certain witnesses herself.

7.    Later that same day – after showing her the photo array – the detectives again spoke with W-1 and told her to adjust her testimony in the following way: to describe the black Coogi-shirted man as punching the decedent with both hands, rather than as making a punching motion to the torso with his left while pulling the decedent down and forward with his right. Meeting with AUSA Anderson that same day, February 14, W-1 initially described the black Coogi-shirted man as punching the decedent with both hands.

8.    On February 16, 2005 – after showing her the photo array – the detectives also spoke with W-3 and told her to adjust her testimony in the following way: 1) to describe the defendant's weapon as a shiny object rather than a box cutter; 2) to state that the defendant had made stabbing rather than slicing motions; and 3) to state that she was unsure if other people jumped into the fight, when she had seen others jump in.

9.    On February 17, 2005, W-3 reported events to AUSA Anderson as suggested to her by the detectives. When AUSA Anderson confronted W-3 with her videotaped statement,

_____

[4] Ms. Anderson is now a Superior Court Associate Judge but at the time was a Deputy Chief in the Homicide Section.

4

W-3 then told AUSA Anderson that she made those changes because the detectives told her to.

10.     On February 17, 2005, the detectives, at the request of AUSA Anderson, interviewed W-2 – not on videotape – and she described what she saw of the fight. She stated that she was 2-4 feet away from the defendant when he pulled out a box cutter and used it against the decedent. She knew the defendant as "Jerome" from previous occasions at the club. W-2 also reported that the day after the incident the defendant called her on the phone and admitted that he "stabbed the motherfucker." On February 17, 2005, the detectives spoke with the witness and told her to adjust her testimony by describing the defendant's weapon as a "shiny, metal object". That same day, W-2 initially told AUSA Anderson that the defendant had used a shiny, metal object, but – during the same interview – admitted she had changed this detail at the request of Detectives Brown and Morales. On February 18, 2005, Detectives Brown and Morales showed W-2 the same photo array including the defendant. W-2 positively identified the defendant.

11.     Confronted now with two witnesses who were changing their testimony at the request of the detectives, AUSA Anderson reported both detectives to their superiors. Both were removed from the investigation.[5]

**Grand Jury Testimony Unaffected by Detectives' Conduct**

12.     In the case of all three witnesses, the interference by the detectives was exposed before she testified in the Grand Jury, however. On March 4, 2005, W-1 testified before a Grand Jury consistently with her videotaped statement. W-1 explained Detectives Brown and Morales'

---

[5] The two detectives assigned to the case now, Dean Combee and Kim Lawrence, were not involved in any of the witness tampering in this case.

attempts to shape her testimony and why she first did as they suggested. The government has provided a redacted copy of this witness' Grand Jury testimony detailing these events to the defense.

13.    The interference by the detectives was exposed before W-2 testified before the Grand Jury. On February 18, 2005, W-2 testified before the Grand Jury consistent with her original statement. The government has provided a redacted copy of this witness' Grand Jury testimony detailing these events to the defense.

14.    The interference by the detectives likewise was exposed before W-3 testified before the Grand Jury. On March 8, 2005, W-3 testified before the Grand Jury consistent with her initial videotaped interview. In the Grand Jury, W-3 explained Detectives Brown and Morales' attempts to shape her testimony. The government has provided a redacted copy of this witness' Grand Jury testimony outlining these events to the defense.

15.    The defendant was arrested on November 25, 2005. He has been indicted on the following counts: Assault with Intent to Kill while Armed; Possession of a Prohibited Weapon; and Obstruction of Justice. Trial in this matter is scheduled for January 3, 2007.

16.    As noted in our opposition to the defendant's motion to dismiss the indictment, the United States believes the defense will attempt to argue that Detectives Brown and Morales directed W-1, W-2 and W-3 "to shape their stories in such a way to implicate [the defendant] in the stabbing of [the decedent]" (Defendant's Motion to Dismiss Indictment ¶ 6), and that the witnesses, had their testimony not been shaped, might have provided exculpatory information. (Defendant's Motion ¶ 7). The defendant argues, therefore, that "the police misconduct in this case can be analogized to cases in which the police deliberately, in bad faith, destroy physical

6

21.    In each of their initial interviews with the police, all three of the witnesses who have positively identified the defendant stated that they saw the defendant in a fight with the decedent, and two out of the three saw him swinging at the decedent with a box cutter.  There was never any question as to whether the defendant was involved in the attack.  The U.S. Attorney's Office learned of the attempts by Detectives Brown and Morales to shape the testimony of these witnesses prior to their presentment to the Grand Jury, and each testified fully and truthfully consistent with their original statements.  Moreover, each witness is expected to testify to the same facts at trial.  Thus the defense should not be permitted to argue that the conduct of Detectives Brown and Morales had any effect on the witnesses' testimony.  The record does not support that claim.  To permit otherwise would confuse the jury and introduce irrelevant and prejudicial evidence into the trial.

9

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the government's opposition to defendant's motion to suppress identifications was served, via fax and email, this 28th day of December, upon counsel for defendant as follows:

J. Christopher McKee, Esq.
Elizabeth Mullin, Esq.
Public Defender Service
633 Indiana Ave, NW
Washington, DC 20004
Fax: 202-824-2952
Tel: 202-824-2352

_____
LYNN E. HAALAND
ASSISTANT UNITED STATES ATTORNEY

11

2.      On February 13, 2005, the lead detectives in the case at the time, Detective Erick Brown and Detective Milagros ("Millie") Morales, showed W-1 a photo array including the defendant. W-1 positively identified the defendant. On February 14, 2005, the detectives interviewed W-1 on videotape and she described what she saw of the fight. She was in the immediate vicinity with the decedent when the fight broke out. She did not see either the defendant or the decedent with a weapon. She knew the defendant as "Gerald" from previous occasions at the club. Prior to the fight, she had seen Gerald at the bar with the black Coogi-shirted man and provided a detailed physical description of both men. Later that same day – after showing her the photo array – the detectives again spoke with the witness and told her to adjust her testimony in the following way: to describe the black Coogi-shirted man as punching the decedent with both hands, rather than as making a punching motion to the torso with his left while pulling the decedent down and forward with his right. Meeting with the first prosecutor on the case, Jennifer Anderson, that same day, February 14, W-1 initially described the black Coogi-shirted man as punching the decedent with both hands.

3.      The interference by the detectives was exposed before W-1 testified in the Grand Jury, however. On March 4, 2005, W-1 testified before a Grand Jury consistently with her videotaped statement. W-1 explained Detectives Brown and Morales' attempts to shape her testimony and why she first did as they suggested. The government has provided a redacted copy of this witness' Grand Jury testimony detailing these events to the defense.

4.      On February 13 or 14, 2005, the detectives interviewed W-2 – not on videotape – and she described what she saw of the fight. She stated that she was 2-4 feet away from the defendant when he pulled out a box cutter and used it against the decedent. She knew the

2

defendant as Jerome from previous occasions at the club. W-2 also reported that the day after the incident, as described in the Affidavit in Support of Arrest Warrant, the defendant called her on the phone and admitted that he "stabbed the motherfucker." On February 15, 2005, the detectives spoke with the witness and told her to adjust her testimony by describing the defendant's weapon as a "shiny, metal object". That same day, W-2 initially told AUSA Anderson that the defendant had used a shiny, metal object, but – during the same interview – admitted she had changed this detail at the request of Detectives Brown and Morales. On February 18, 2005, Detectives Brown and Morales showed W-2 the same photo array including the defendant. W-2 positively identified the defendant.

     5.      The interference by the detectives was exposed before W-2 testified before the Grand Jury. On February 18, 2005, W-2 testified before the Grand Jury consistent with her original statement. The government has provided a redacted copy of this witness' Grand Jury testimony detailing these events to the defense.

     6.      On February 14, 2005, the detectives interviewed W-3 on videotape and she described what she saw of the fight. She knew the defendant as Jerome through W-2 from previous occasions at the club. She was approximately 6-7 feet from the defendant when he pulled out a knife and began throwing punches at the decedent with it. She provided a detailed physical description of both the defendant and the black Coogi-shirted man. That same day, Detectives Brown and Morales showed W-3 the same photo array including the defendant. W-3 positively identified the defendant as the person who stabbed the decedent. On February 14, 2005 – after showing her the photo array – the detectives spoke with the witness and told her to adjust her testimony in the following way: 1) to describe the defendant's weapon as a shiny

3

object rather than a box cutter; 2) to state that the defendant had made stabbing rather than slicing motions; and 3) to state that she was unsure if other people jumped into the fight, when she had seen others jump in. On February 15, 2005, W-3 reported events to AUSA Anderson as suggested to her by the detectives. She then told AUSA Anderson that she made those changes because the detectives told her to.

7.     The interference by the detectives was exposed before W-3 testified before the Grand Jury. On March 8, 2005, W-3 testified before the Grand Jury consistent with her initial videotaped interview. In the Grand Jury, W-3 explained Detectives Brown and Morales' attempts to shape her testimony. The government has provided a redacted copy of this witness' Grand Jury testimony outlining these events to the defense.

8.     The defendant was arrested on November 25, 2005. He has been indicted on the following counts: Assault with Intent to Kill while Armed; Possession of a Prohibited Weapon; and Obstruction of Justice. Trial in this matter is scheduled for January 3, 2007.

9.     The defendant now moves to dismiss the indictment against him, on the grounds that first, Detectives Brown and Morales directed W-1, W-2 and W-3 "to shape their stories in such a way to implicate [the defendant] in the stabbing of [the decedent]" (Defendant's Motion ¶ 6), and that the witnesses, had their testimony not been shaped, might have provided exculpatory information. (Defendant's Motion ¶ 7). The defendant argues, therefore, that "the police misconduct in this case can be analogized to cases in which the police deliberately, in bad faith, destroy physical evidence that may have been exculpatory to the defendant during the collection of the evidence." (Id.) The defendant's arguments are without merit and should be denied.

4

## II. ARGUMENT

10.     The defendant's argument misses the mark both factually and legally. As a factual matter, the interference by Detectives Brown and Morales was exposed <u>before</u> the Grand Jury voted to indict the defendant. Thus the Grand Jury heard the witnesses' original statements, the ways in which the detectives asked them to shape their testimony, and their live testimony – in which all three testified consistent with their original statements and not according to the detectives' suggestions – and it still found probable cause to indict. Given that the Grand Jury had the full story before it, the witnesses showed they were not tainted. The indictment therefore should stand.

<u>The Defendant's Claim is Not Supported by the Facts.</u>

11.     The government makes no attempt to excuse or minimize the fact that Detectives Brown and Morales attempted to influence the witnesses in order to emphasize the defendant's role in the offense here. However, they did not invent the defendant's role as he suggests. ("The police knew that the witnesses were implicating someone other than Jerome Jones and yet directed them to alter their testimony to inculpate Jerome Jones." Defendant's Motion ¶ 9.) From the very beginning, all three of these witnesses stated that they saw the defendant in a fight with the decedent, and two out of the three saw him swinging at the decedent with a box cutter. There was never any question as to whether the defendant was involved in the attack. Moreover, in each case, the detectives' interference came <u>after</u> the witnesses had implicated the defendant. Equally important, with respect to the validity of the indictment, in each case, the detectives' interference was exposed <u>before</u> the witness testified before the Grand Jury. Thus the Grand Jury was able to judge for itself the extent of the detectives' influence on the witnesses, and it still

5

found sufficient evidence to indict.

12.    The chronology of events is as follows.  W-1 selected the defendant's photo, in less than one minute, on February 13, 2005.  W-1 was interviewed by Detectives Brown and Morales on videotape on February 14, 2005 and described the fight between the defendant and the decedent.  Later that same day – after showing her the photo array –  the detectives again spoke with the witness and told her to adjust her testimony in the following way: to describe the black Coogi-shirted man as punching the decedent with both hands, rather than as making a punching motion to the torso with his left while pulling the decedent down and forward with his right.  She initially did so, and then explained everything truthfully to AUSA Anderson.  She also testified consistently with her original video statement before the Grand Jury.  See paragraph 3 above.  This change with regard to the actions of the black Coogi-shirted man does not affect W-1's implication of the defendant.

13.    There is also no evidence that the interference of Detectives Brown and Morales affected W-2's implication of the defendant in the attack.  On February 13 or 14, 2005, the detectives interviewed W-2 (not on videotape).  She described the fight between the defendant and the decedent.  On February 15, 2005, the detectives spoke with the witness and told her to adjust her testimony by describing the defendant's weapon as a "shiny, metal object".  That same day, W-2 initially told AUSA Anderson that the defendant had used a shiny, metal object, but – during the same interview – admitted she had changed this detail at the request of Detectives Brown and Morales.  W-2 identified the defendant from the photo array, in less than one minute, on February 18, 2005.  That same day, W-2 testified before the Grand Jury consistent with her original statement.  See paragraph 5 above.  At no time did W-2 state that the defendant was not

6

involved in the fight with the decedent.

14.    W-3's implication of the defendant in the attack likewise came before Detectives Brown and Morales suggested that she testify in a way that emphasized the defendant's role. On February 14, 2005, the detectives interviewed W-3 on videotape and she described what she saw of the fight. She provided a detailed physical description of both the defendant and the black Coogi-shirted man. On February 14, 2005 – after showing her the photo array – the detectives spoke with the witness and told her to adjust her testimony in the following way: 1) to describe the defendant's weapon as a shiny object rather than a box cutter; 2) to state that the defendant had made stabbing rather than slicing motions; and 3) to state that she was unsure if other people jumped into the fight. On February 15, 2005, W-3 reported events to AUSA Anderson as suggested to her by the detectives. She then told AUSA Anderson that she made those changes because the detectives told her to and subsequently testified truthfully before the Grand Jury. See paragraph 7 above. At no time did W-3 state that the defendant was not involved in the fight with the decedent.

15.    The facts show that the full extent of the interference by Detectives Brown and Morales became known almost immediately. All three witnesses knew the defendant prior to February 13, 2005. All of them positively identified the defendant as being involved in the attack on the decedent. There is no evidence that the detectives coerced any witness into identifying the defendant. The government submits that had the detectives coerced or attempted to coerce any witness into identifying the defendant, she would have disclosed that fact also.

16.    The defendant's speculation that absent the detectives' interference, the witnesses might have provided some other vital exculpatory evidence is similarly baseless. From

7

the beginning, all three placed the defendant at Club U and as taking part in the attack on the decedent. Since the detectives suggested that the witnesses testify to emphasize the defendant's role after their original statements and before their Grand Jury testimony, and each witness testified truthfully before the Grand Jury consistent with their original statements, there is no reason to suppose that any one of them would have exculpated the defendant. They had the opportunity to do so in the Grand Jury and did not. No evidence was "destroyed." (Defendant's Motion ¶ 11.)

The Defendant has Not Met the Legal Standard for Dismissal of the Indictment.

17.    The defendant's argument also fails as a matter of law. In analogizing this case to those where police deliberately destroyed exculpatory evidence (Defendant's Motion ¶¶ 7-9), the defendant sidesteps the legal standard governing exercise of judicial supervisory power over an indictment as established by the Supreme Court in Bank of Nova Scotia v. United States, 487 U.S. 250 (1988) and United States v. Williams, 504 U.S. 36 (1992). In Bank of Nova Scotia, the Supreme Court held that in reviewing the validity of an indictment, the harmless error inquiry applies. Id., 487 U.S. at 256. Thus where a defendant seeks dismissal for nonconstitutional error, a court should dismiss an indictment "only if it is established that the violation substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." Id. (internal citations omitted). Moreover, the Supreme Court has held that federal courts cannot use their supervisory power to dismiss an otherwise valid indictment for failure to present even substantial exculpatory evidence to the grand jury. Williams, 504 U.S. at 53-54.

18.    The District of Columbia Court of Appeals likewise has employed this standard.

8

In <u>Jones v. United States</u>, 893 F.2d 564, 566 (2006), the court held that "where false material testimony was presented to the grand jury, dismissal [of the indictment] is warranted only where it is established that the false testimony substantially influenced the grand jury's decision to indict or where there exists a grave doubt whether that decision was free from the substantial influence of the false testimony." (Citing <u>Hunter v. United States</u>, 590 A.2d 1048, 1052, internal quotations omitted.) <u>See also</u> <u>Sanders v. United States</u>, 550 A.2d 343, 345 (1988) (finding gross negligence on the part of the prosecutor for presenting false testimony to the grand jury did not warrant dismissal of the indictment, following <u>Bank of Nova Scotia</u>).

19.    The defendant has not met his burden here. In this case, there was no perjured or false testimony as in <u>Jones</u> or <u>Hunter</u>, where the D.C. Court of Appeals still upheld the indictments. There was no undisclosed or destroyed exculpatory evidence, which the <u>Williams</u> Court still denied as a basis for dismissal. The Grand Jury had the opportunity to consider the detectives' interference and still found probable cause to indict. Thus the defendant suffered no prejudice. Without proof of harm to the defendant, the indictment should stand. <u>Bank of Nova Scotia</u>, 487 U.S. at 254.

20.    The case law specifically addressing police misconduct in the context of dismissal of an indictment also does not lend support to the defendant. Police misconduct may result in dismissal where the misconduct is so "outrageous" or it "shocks the conscience" to such a degree that it deprives the defendant of his due process rights. <u>See</u>, e.g., <u>Rochin v. California</u>, 342 U.S. 165 (1952) (finding that it shocked the conscience when police forced the defendant's stomach to be pumped following a warrantless search). While not condoning the detectives' conduct here, the defendant has not made a case for a deprivation of his due process rights. The

9

Grand Jury had sufficient evidence to indict.

### III. CONCLUSION

21.     In each of their initial interviews with the police, all three of the witnesses who
have positively identified the defendant stated that they saw the defendant in a fight with the
decedent, and two out of the three saw him swinging at the decedent with a box cutter. There
was never any question as to whether the defendant was involved in the attack. The U.S.
Attorney's Office learned of the attempts by Detectives Brown and Morales to shape the
testimony of these witnesses prior to their presentment to the Grand Jury, and each testified fully
and truthfully consistent with their original statements. Thus the defendant was not prejudiced
by the detectives' interference, there is no reason to believe that the witnesses had more
exculpatory evidence that they did not provide, and the indictment is not flawed in any way.
Neither the facts nor the law supports dismissal of the indictment here or any other sanction.

10

WHEREFORE, the government respectfully requests that the defendant's motion be denied.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

GLENN KIRSCHNER
CHIEF, HOMICIDE SECTION

DAVID GORMAN
DEPUTY CHIEF, HOMICIDE SECTION

THOMAS A. DIBIASE
ASSISTANT U.S. ATTORNEY

LYNN E. HAALAND #454120
ASSISTANT U.S. ATTORNEY
U.S. Attorney's Office
Homicide, Room 9439
555 Fourth St. NW
Washington, DC 20530
(202) 353-8815

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the government's opposition to defendant's motion to suppress identifications was served, via fax and mail, this 27th day of November, upon counsel for defendant as follows:

J. Christopher McKee, Esq.
Elizabeth Mullin, Esq.
Public Defender Service
633 Indiana Ave, NW
Washington, DC 20004
Fax: 202-824-2952
Tel: 202-824-2352

LYNN E. HAALAND
ASSISTANT UNITED STATES ATTORNEY

11